2007, 5-0, 4-0, and you can finish it when you are ready. Thank you. May it please the Court, the Court should reverse the award of cost of replacement damages, both because it was based on a hypothetical model and because the trial court adopted the model using a procedure that deprived the government of its right to a fair trial. Turning to the model itself, the trial court erred when it awarded damages on a hypothetical cost of replacement model. The American Federal issued stock in 1993 purportedly to replace the supervisory goodwill that had been eliminated in the breach. And it paid dividends on that stock from 1993 until 1997. In 1997, CCB acquired American Federal and canceled the stock. And the Court held, and this is in A-20 in the record, that that acquisition was not breach-related. So that was a break in any causal chain. Now, the Court's model calculates dividend damages not only from 1993 to 1997, but it continues those dividend damages from 1997 into the future of 2011. I'm calling them hypothetical dividends. What's a hypothetical dividend? Your Honor, a hypothetical dividend is one that was never paid. Your typical damage model- Never paid or should have been paid? Never paid. Didn't need to be paid. Your typical damage model, Your Honor, compares the but-for rule, as if there was no breach, with the actual rule. And the difference is obviously damage. Here, what the Court did was it compared the but-for rule, to some extent at least, with another hypothetical rule. Not what actually happened, but with dividends that were never paid. And so what you have is a hypothetical rule compared to a hypothetical rule. And the result, of course, is speculation. But wasn't that basis essentially saying, I'm going to give up the hypothetical dividends as if the 1997 merger never took place? That is. In fact, the Court said that it was looking at what dividend rate American Federal would have paid subsequently had the merger not occurred. But the merger, first of all, of course, was not breach-related. But the second thing was, the stock no longer existed. The company no longer existed. There was no one to pay dividends to anyone. And American Federal paid dividends. Right. What did it do? CCB, for two years after AmFed was acquired by CCB, it paid some dividends to its parent. After that, it was merged into one of CCB's other banks, other thrifts, and it disappeared altogether. Then CCB was acquired, and then its acquirer was acquired, all in non-breach-related acquisition. And what the Court found was the plaintiff's model was based on those dividends, those dividends from American Federal to CCB, and CCB to its shareholders, and so on. The Court rejected that model because it said those dividends were speculative. So we know that the actual dividends that were actually paid were speculative. And we know that American Federal and its stock no longer existed. Well, it did exist for two years. It's subsidiary, right? It did. But what the Court found and what the evidence showed was that even then, those dividends that were paid during those two years were not related to the breach. The testimony was very clear. This is in the record of A-100-980. This is the plaintiff's witnesses. After the CCB acquisition, American Federal adopted CCB's dividend policy. So it wasn't paying dividends based on its own policy. So is the government's position that after 1997, no dividends were paid, but damages were calculated as if they were paid, and that should not have been done?  Before 1997? Yes, Your Honor. And indeed, before 1997, the trial court – first of all, there's $3.6 million worth of damages that the Court awarded that we are not challenging. So the actual, what we call flocation costs and other costs, they were not challenged in those inclusions that we will disdain. But as far as dividend costs and the like, from 1993 to 1997, those are actual dividends. We have other problems with what the Court did, but those were actually paid. I don't want to hide the ball from the Court. If the Court cancels the hypothetical dividend, there is no further damage to be awarded in this case, because basically the trial court needed the hypothetical dividends to create damages for the plaintiffs. Wait, that's post-87? Post-97. Well, post-97, the government also argues there's a standing issue, right? That the acquired American Fed would be the one that would have to challenge this amount and have standing. If there was damage, if the issuance of dividends at that point was damage, which we challenged, which the Court rejected, it would be CCB and those subsequent people who were in some way damaged and know they're not plaintiffs here, so they don't have privilege to challenge that. I'm sorry, Your Honor? It did, Your Honor. But I'll give you an example. The record shows that American Federal paid a $25 million dividend, so separate from its normal dividend while it still existed, to assist with CCB's stock repurchasing plan. And that's in the record at A-100-983-984. That had nothing to do with the breach. That was CCB deciding to purchase back some stock. And that's an example of CCB telling its subsidiary, give us money for a certain project and money be paid. Having nothing to do with the dividends paid because people purchased the stock or people had the stock from the 1993 stock sale and conversion. The retained earnings issue, Your Honor, and I'm mostly going to rely on the briefs on the retained earnings issue, but basically, the trial court decided not to count retained earnings. There's no question, it's undisputed, that American Federal issued a capital plan. It sent a plan to the government. This is how we're going to return it to capital compliance. It's undisputed that one element of the capital plan was American Federal was going to retain their earnings, not pay them out, to rebuild its dividend, its capital. There's no dispute that it retained $32 million worth of those earnings and returned it to capital compliance, returned to and was projected to meet all the FIRAs required based on those. Given that, you can look at it one or two ways. In 1993, when they raised all this capital, they didn't really need to raise any of it, but certainly they didn't need to raise all of it. At that point, the goodwill bucket had less than $4 million, $4.5 million in it. But that was still short because even if they retained all of their earnings during that time period, it would still be about $4 million short of their regulatory capital. They were in compliance with the requirements under the capital plan that they had submitted and they were in requirement. And by the end of that year, they were in compliance with all the requirements, even without this capital infusion. So they didn't need it. What they did for a business decision in 1993, they decided to set out and simplify their balance sheet and to raise some more capital. It didn't have to be done. These retained earnings were mitigation. And respectfully, Your Honor, the trial court or the plaintiffs should be in a position to say, we're going to count this as mitigation and not that. But you said, you mentioned that there was a specific capital plan. How is this case different than the home savings? And home savings, this court says, they said that they were allowed, the plaintiff was allowed to keep this discreet cushion that they had said they needed and therefore that amount couldn't be used to mitigate. Your Honor, these plaintiffs did not have a cushion. Before they raised this money in 89, just a few months before Fire Eagle was passed, they were out of capital compliance for the previous six years. They did not have a record that's home game of having this cushion, wanting this cushion, insisting upon this cushion. So this is a different set of facts, Your Honor. And briefly, Your Honor, I wanted to turn to the methodology by which the trial court adopted this model. The trial court created this model, except this model was not proposed by any of the plaintiffs. The plaintiffs, the experts were all rejected. And in the procedure that the trial court used, it deprived the government of a fundamental right. What the trial court adopted was a 10-part model. In that model, elements of which we had never seen at trial, it's not that he took the plaintiff's model and just adjusted it a little bit. It's not like that. But it seems to me if the government wins on that theory, you get a do-over. Yes. You don't win, you just get a do-over. Yes. You get it back and let the court do a do-over. Is that really what the government's seeking here? If the court gets to that and addresses the hypothetical model and reverses because of that, no, we don't need to get to the manner in which it was obtained, Your Honor. And in the same way on the sub-debt issue, which at least was reached through the trial court's methodology, the trial court reached a conclusion about whether to count the repayment of sub-debt. I'm not going to get into the details, but whether to count that as a benefit that they got under the breach. Our expert and plaintiff's expert agreed it was a benefit. You can look in the appendix at 201-935. That's the plaintiff's amended expert report. At paragraph 8, plaintiff's expert says, I calculated the benefit of the avoidance of principal and interest on the series B sub-debt. The next paragraph, paragraph 9, he says he's in agreement with the government's expert. But in the trial court's model that it created, it chose not to count it as a benefit, even though all the experts disagreed with it. And so I raise this, Your Honor, both to demonstrate the problem of the trial court adopting a model which has not been subject to discovery, has not been subject to trial testimony, which is what happened here, and to show that if the court reaches the conclusion that both the plaintiff's expert and our expert reached on the sub-debt, which is that it should count as a benefit to the plaintiffs in working out the damages, if that happens, then again, the court need not reach the methodology that it was acquiring, because that, again, will not help the plaintiff's case. Well, we were on the reach then methodology if we disagreed with the hypothetical due petition. Yes, Your Honor. And I'm going to resume the remaining part of my time. Will you say before you, Mr. Benson, Mr. Bergman. And please, the court, David Bergman, will hold the order for the plaintiff at the American Federal Bank. Let me start right with the hypothetical dividend question that the court has. And I think the intention of some of the briefings here, I agree with the closing counsel's statement that a hypothetical dividend, perhaps as well, has never been paid. That is not this case. This is a case where dividends were paid, continue to be paid today, but replaced with capital funds. They are paid by the successors and increased to American Federal Bank. We sought to recover those ongoing dividend payments. Yes, Your Honor. Well, all of the cases, Your Honor. All of them, and the self-proclaimed and others, said you measure the cost and benefits of replacing capital through the phase-out schedule of a good or really a subordinated debt here. So the actual cost of mitigation should be paid. Absolutely. So how does a hypothetical dividend, an actual cost of mitigation? Here, Your Honor, there is no hypothetical. There is an actual dividend paid. It's paid through 1997 directly by American Federal Bank. It's continued to be paid through 1999. The dividend went up with the merger with CCB. The court said that's a remote consequence. He's not going to give us the full amount of the dividend paid after 1997 because he believes it was, in fact, by this remote event that increased the dividend payment. If you're paying the dividend, is there a presumption that you have profits and earnings at that point in time? Otherwise, you could not pay the dividend. I believe that's correct. If you have a P&E, then would that be in compliance with regulatory capital at that point? You couldn't declare dividends unless you were in compliance. I don't think that's necessarily correct. I believe you could get permission to pay dividends while being out of technical compliance. Perhaps that would be in compliance if you were permitted. That may be the case. But in all of the cases, the cost of capital has been measured by the payment of dividends. That's in home. That's in LaSalle. That's also in the recent decision to pay up in America. What about Goldstone? Goldstone still requires an actual damage. Well, Your Honor, absolutely there are actual damages here. They were measured faithfully to this court's precedent. They were measured absolutely consistent with the evidence that was presented. These are not hypothetical. They are still being paid today. The court ordered only a portion of them. What the court did was he froze the dividend rate in 1997. He froze the earnings rate in 1997 despite the fact that from 1990 to 1997, America's federal annual earnings more than doubled. The court is conservative. I'm not going to assume that it keeps going up. I'll freeze it in 1997. I will not give you the actual dividend history because that is affected by the remote mergers. So, Your Honor, the court did exactly what was directed in home, in LaSalle home. He used the actual dividends paid for up until the time when that could no longer be calculated with certainty. And then he did just as in home in LaSalle home. He projected the dividends that would be paid. Here it's a portion. He projected what is a portion of the dividends actually paid and being paid today by America's federal successors to the providers of that replacement capital. What was the stock issued to the public? Was that in 1988? There was an initial going public in 1988. Yes, Your Honor. And then in 1993, there was a secondary offer that provided stock to the replacement capital from hires. But the 1993 transaction was really a reorganization. It was debt and sub-debt. No, it was also a secondary offering. At the same time. At the same time. And the evidence is overwhelming that that secondary offering was caused by the breach. The organization was caused by the breach. There was overwhelming evidence of that. So it's in the documents. It's in the testimony. And it's been repeatedly supplied in fact by the trial court to which this court should defer. But when you did go public and you issued stock to the public and some of the other stockholders in conversion of the debt, how was the damage incurred by that? Well, the conversion of the debt to defer was in 1990. And defer was converted to common stock in 1993. That was, again, the trial court found caused by the breach. The result was that there was increased costs to American Federal. How did that cost increase as you issued common stock to the public and to the debt holders? Is that a real economy? It absolutely is, Your Honor. For example, the common stock issued in 1993 in exchange for the preferred stock. The common stock, it's really – I'm sorry, that's a bit rough. The common stock issued in exchange for the preferred stock and also issued to the sub-series A sub-debt holders, in a quote from a piece, those are issuances that American Federal could have sold rather than confer on the could have sold in the open market. We know exactly how much it would have cost if American Federal would have received. It's a liquid instrument that the recipients could have sold. Did the venture holders have a right to convert at one time? Did they not? Did they have a right to common stock? The series A venture holders did, yes. So how is that more of a limitation than what would be subject to the law? Well, what the trial court found was that the series A warrants would not have been exercised until 2004 because of the breach. They were exercised earlier, which forced American Federal to pay the cost of that capital, to pay dividends for those 11 years. But it couldn't pay dividends unless they had earnings and profits. Absolutely true. They had earnings and profits, and they had to pay out of those a cost that they would not have had to pay had there been no breach. But there's no requirement that you pay dividends in common stock, is there? For this institution, that was a practical requirement. It was competing against its peers. There is not a legal requirement to pay dividends in common stock. And I'm aware of it. There is a practical requirement here to behave like a bank. That is what the market expected and insisted. That's what the capital providers insisted on. Were we talking about the issuance of more common stock in lieu of dividends? Your Honor, if I may anticipate the West Bed payment in kind issue. In West Bed, the government has twice in its briefs described the payment in kind in West Bed as a payment of stock. And that's not true. In West Bed, it was a payment of a diventure. And the court found that it was a diventure of unknown value. There wasn't a ready market for it at the time. And only a potential future obligation, not knowing whether or not actually the conditions necessary for payment on that diventure would be triggered. Here, we have a payment of a stock publicly traded on the most liquid market in the world, the New York Stock Exchange. This is much more similar, Your Honor, to the Bank of America case, which came out over the summer. And if I may, I'll just read a discussionary of payment in kind which I think controls here. It's found at 495 F. 3rd, 1366, at 1373 and 74. And it's under the heading liquidated dividend of about $3.5 million. The court here asserts that this issue seeks recovery for real estate transferred to HFH partners and later sold. Specifically, this issue concerns recovery for the share of the real estate from the real estate sale that was being paid to the Bishop Estate, which was the replacement capital provider. The trial court held the transfer of the real estate to HFH with the payment of the dividend in time, made as a direct result of the breach. But for the breach, Arm Fed would not have to transfer 26% of its stock to Bishop Estate. This court firmly ruled that the cost borne by the successor, the Fairbank of America successor to Arm Fed Bank, and affirmed an award of cost of capital based on that payment in time. That is much more similar to our case here. In fact, our case is, I think, an easier one. We have a publicly traded stock. And as I say, precisely known value, easing liquidity. And that was a cost borne by American Federal and a value demanded by the replacement capital providers. The 626,000 some odd shares that you're issuing to make up the dividends in 1993 were common stock shares. That was not a pick. That was not a payment in time. That was really a payment in common stock. I think I agree with that. The government characterizes it as a payment in time. It says because it's not cash, it doesn't count as cost. It's a cash equivalent. Well, it's a cost to whom? To American Federal Bank, which could have sold the shares. Well, the shareholder is American Federal Bank, not to the bank itself. No, well, to the bank itself. The bank itself is the shareholder. That is absolutely a cost to the bank. The bank could have sold that 628,000 shares of itself on the open market and received that capital. If it wanted to. Well, they could have added some more shares to it and diluted it even more. Well, that is not. Is dilution a cost factor for the bank? Your Honor, it certainly is, in this instance, that there is stock issued that could have been sold on the open market and we know exactly how much money American Federal would have received and instead it had to pay that as compensation in replacement capital for buyers. And it's absolutely a cost to the institution. And as I said, it's absolutely precisely known. This is not, as it must have been, where it's inchoating future operations. What specifically was American Federal going to do with the retained ratings? I'm just wondering if there was some specific mission. Yes, well, yes, but let me back up a moment, Your Honor, and say that before going public in 1988, American Federal had had several years of success coming off of several very tough years. So in mid-1988, 687 was quite successful, but it's still not meeting regulatory capital norms. It went public, converted from mutual to stock corporation at the end of 1988. It raised more than was necessary to meet bare minimum capital and, in fact, established a capital cushion as a whole. It was about $27 million over capital requirements. American Federal stated to investors, investment bankers, the investment community, we do not expect to pay dividends on this stock because we are going to make sure we maintain our capital cushion and use the excess capital to grow. Do acquisitions grow? That was the plan with respect to retained ratings. It was followed for only about a year until the government breached, but that was absolutely the plan, and the testimony and the documents, the letters, the statements and annual reports all stated for the foreseeable future we will not pay dividends. We will retain our earnings. They were going to be a growth stock, not a traditional bad stock. But there's no real case that's gone as far as you're suggesting we go in this case with respect to retained earnings. My concern is frankly what you're talking about. I think that that's the original compensation. I think the compensation evidence was much more tangible and specific with respect to the mutual cushion. Am I wrong about that? Your Honor, respectfully, I think the court is wrong in that conclusion because I think the evidence here is very, very strong that American Federal had no intention of paying dividends and wanted to retain earnings. Before the breach, it had a $27 million capital cushion. After the breach, in 1993, with all of the retained earnings and with all of the capital raised in 1993, not just the portion of the capital that the trial court allocated as replacement capital, all of that capital, the capital cushion in 1993 was only $26 million, less than in the previous breaches. So there is no evidence on the record with respect to lost profits or sort of opportunity costs with respect to the retention order? I think that is correct, Your Honor. As the trial court noted, the government argument that retained earnings should be viewed first as the replacement capital was brought in very late in the trial and in the post-trial briefing. The position of American Federal is open now. It is the secondary offering that the breach caused, and that is what we used to mitigate. Your Honor, it is hard for me to understand how it can be viewed as a mitigation to have fewer retained earnings than we would have but for the breach, which is a factor. Another key factor here, Your Honor, is that the capital plan was clearly imposed because of the breach. It is also clear that American Federal would not be released from the capital plan without the 1993 secondary offering restructuring. That was a condition that the government proposed to release American Federal from the capital plan, and there was no way that anyone would consider American Federal to have mitigated the harms of the breach until it was released from the capital plan. Your Honor, the real issue is what the actual damages were of 1992 at that time. What were the actual damages to 1993? They were enormous, but they were not calculated in the trial below the damages to 1993. What was calculated and what was awarded were the costs of mitigation. Those costs, as in Holland and as in Los Alamos, extend through the amortization period of their will. That is, we should be able to recover, we should be able to have the capital on our books as long as the government promised it. That is the same thing that was done in Holland, the same thing that was done in Los Alamos. You project the cost into the future, your present value in the back. That is what this Court did here. We were entitled to have the capital on our books until the expiration of the government promise, which for the sub-debt was until 2004, and 10 years later on that floor. Was that really the determination of what the real cost of capital would be? Yes, that is what the trial court determined, the real cost of capital, and I believe the trial court did that precisely, conservatively, and faithfully with this Court's precedence. And how do you justify that on the issue of hypothetical dividends? Is that a real cost at that point? These are absolutely a real cost. In fact, we were awarded only a portion of the real cost because of the remote, the court trial court found it to be a remote event. We were not awarded the full payments that had been made to the replacement capital providers. We've been awarded only a portion of those. Those are real costs. Thank you, Your Honor. Thank you, Mr. Berger. Mr. Gibson has some rebuttals. Thank you, Your Honor. Plaintiffs try to characterize the hypothetical model as a fraction of the actual dividend. That's not the case. As the court said about the plaintiff's expert, Mr. J's calculation of damages after the second quarter of 1997 had to be discarded because those calculations reflected dividends paid by the merged entities to their shareholders or to their holding companies. That's A5556. The court rejected there because it was based on the actual dividends, because they were speculative. So the court didn't then take some percentage of those and make a percentage of some speculative number. What it did was it created this hypothetical model. What would have happened if? And compared to this hypothetical but for oral and created a speculative result. Absolutely, Your Honor. We don't have an actual world where they continue to exist. So the court assumed that the last quarter of earnings was going to be their actual earnings forever. And then, instead of... At that point, they were only paying 27% of earnings as dividends. The court assumed in the future that they would have started paying 34% rate of dividends. So it's a hypothetical built on an assumption built on a hypothetical. It is... No entity existed to pay these damages. The plaintiff's expert, Mr. J, testified at A101-636 that Amfed no longer existed. Its shares were transformed into CCB shares after 1997. The LaSalle and Holm, those cases rely upon the fact that the dividends were actually paid. That's not the difference here. Plaintiffs try to create a difference between a projection and a hypothetical. They say the court projected damages. Your Honor, if I projected a baseball player how many home runs he's going to hit next year, that's projection. If I try to tell you how many home runs he would have hit last year had he not been injured, that's a hypothetical. What the court did was... It's starting in 1997. They wrote this opinion in 2006. Starting in 1997, he's telling the government, you have to pay damages on money that would have been paid, had a series of facts not existed. That's a hypothetical. That's not a projection. Now... Your Honor, I couldn't find any record showing whether or not the acquisition was completed in 1997 and took into account any kind of future cash flows because $470 million was paid to stockholders. How is that calculated? Is there any evidence in the record? I couldn't find it. No, Your Honor. It did result in $170 million profit to the shareholder. It was a very, very good deal for them. The calculation on how CCB came up with it, presumably it was based on what they thought the property was worth based on its future. But there's nothing in the record that does. Not that I'm aware of, Your Honor. To Judge Post, you asked about retained earnings. The plaintiffs didn't seek damages on retained earnings. They didn't say these were a cost to them. That sets them apart from the home-saving plaintiffs. They did seek lost profits. They said we had all these possibilities. The court rejected that. It said that they didn't identify or prove that they had an alternative investment. That's why there's no damage on their retained earnings. But there's no question that they retained them. And what they want to say is, look, we had an empty bucket. It was empty because of the breach. And we got all these retained earnings. And we put them in the bucket. But you shouldn't count that as mitigation, even though we pretty much filled up the bucket. No, no, you should empty that out and start the bucket again. And now we can charge the government for refilling the bucket on something that's very expensive. Moving on to another point, do you have any disagreement with your colleague with respect to his position in Panic of America? Panic of America? What was the case? That was intentionally income payments in Westchester. Oh, the Panic of America. I do, Your Honor. What AMFED did was this. It owed some money to these preferred shareholders. And it gave them $600,000, $600,000 common stock. It shares a common stock. Now, what this court has held in AMFED, and actually, I mean, in WestFed, and in some of the other cases, the mere issuance of that common stock, that's not the cost. The time to reestablish a cost on the issuance of common stock is when dividends are paid. So the mere fact that AMFED gave those people common stock under this court's jurisprudence, there was no cost there. And it shouldn't have been counted against them. Later, when dividends, the court says, well, dividends are paid on that. It also counts damages then. It's sort of double counts. It really is double counts. It counts damages when the $600,000 shares were issued. And then later, when dividends were paid on those $600,000 shares. Unless there's any other questions, Your Honor, for these reasons and those in our brief, we ask the court to reverse the order of damages. And then the alternative, we ask for a remand so that we may have a discovery of your testimony on this. Thank you.